Case number 14-5105 et al. James Owens et al. v. Republic of Sudan Ministry of External Affairs and Ministry of the Interior of the Republic of the Sudan Appellant Islamic Republic of Iran Ministry of Foreign Affairs et al. Mr. Curran for the Appellant Mr. Neuberger and Mr. McGill for Appellant James Owens et al. Mr. Curran, reporting. Good morning. May it please the Court, Christopher Curran for Sudan. The Foreign Sovereign Immunities Act in Section 1605 A like its predecessor, 1605 A7 has four predicate acts that can support the assertion of lack of immunity on the part of a foreign sovereign. One of those is extrajudicial killing. Extrajudicial killing, like the other three predicate acts, has a meaning under international law and has a specific convention adopted by most nations of the world. In interpreting 1605 A this Court ought to abide by the definition of extrajudicial killing as that term is used in the international convention and is widely understood in international law generally. Now here the problem is as the plaintiffs point out and as the District Court found 1605 A, when it defines extrajudicial killing refers to the TVPA and specifically Section 3 of the TVPA. Section 3 of the TVPA defines extrajudicial killing but it doesn't include all aspects of it because some of those other aspects, like the state actor requirement, are in other portions of the TVPA, specifically Section 2. So the nub of the question here is in determining what extrajudicial killing means should this Court focus exclusively on Section 3 or should it consider the meaning of that term as it is meant more broadly in the TVPA and in other contexts? Don't we have to follow what the statute tells us the definition is in 3A? Well, I think what this Court needs to do is to use all of the interpretative tools available to it under a conventional statutory analysis and I submit that when those tools are all considered it becomes apparent that Congress intended for extrajudicial killing to mean what it means in the Geneva Convention or what the term summary execution means in the Geneva Convention and what the term extrajudicial killing means in other international law parlance. And Judge Henderson, I get there in a couple of ways. Number one, I note that at the outset of Section 3 of the TVPA that the language reads, for purposes of this Act, I submit that that suggests, at least, it maybe isn't decisive, but it suggests that the definition ought to be read in the context of that Act as a whole. And then another point here, I think analyzing just 1605 A and its predecessor, one can conclude that Congress must have meant extrajudicial killing in the broader sense and for that I point the Court to the definition of aircraft sabotage. Aircraft sabotage is also defined in 1605 AH and there Congress wrote that that term shall be used as that term is used in the Aircraft Sabotage Convention with the Convention on Aircraft Security. In fact, that Article I of that convention doesn't even use the term aircraft sabotage. My point there being, we cannot attribute to Congress the precision and meticulousness that we might expect of others. And that's apparent. I don't know that... I wouldn't take the opposite position and say when they meant for us to look at international conventions, they said so. Are you saying there are gaps in 3A, gaps in the definition, and that they're filled in by international law? No, no, no. I'm saying that Section 3A needs to be considered with Section 2 and the context of the TVPA because the TVPA itself in Section 2 makes it clear that an extrajudicial killing can only be done by a state actor. And that is the sense of the term under international law. The plaintiffs in the District Court, I submit, are being myopic in analyzing only the remaining aspects of extrajudicial killing in Section 3A and are not considering the state actor requirement. And where I'm getting at with my analogy to the aircraft sabotages, that proves that Congress was painting with a broad brush here. When it referred to the predicate acts and the definitions extrajudicial killing as well as aircraft sabotage and torture and hostage taking, it was referring to those concepts as they're meant in the relevant conventions. And it's taking too narrow of a view to ignore the state actor aspect of extrajudicial killing. Mr. Kern, if you're right, how do you relate that to the requirement of material support, the element of material support? You have a state actor providing material support to another state actor who is engaging in the killing? Yeah, well, I submit it doesn't have to be the same state actor. It doesn't have to be the same foreign state, right? In fact, I would refer to the allegations in this case, which are that Iran and Sudan together engaged in material support for a terrorist act. There could easily be a situation where one foreign state conducts an act and there's an allegation that another foreign state provided material support. And in that situation, the second foreign state would be providing material support for an act by a state actor. So that's certainly one scenario where that interpretation would hold. A little narrow. Well, it may be, but not all of the predicate acts in 1605 capital A require state actors. So the provision as to material support may be most relevant as to the predicate acts that don't require state actor action. I think hostage taking is one that does not require a state actor. So in that situation, if you have a foreign state that provides material support to a hostage taking by a private party, the act would fit naturally in that scenario. And from here, I pivot. Let's consider the alternative. If extrajudicial killing doesn't mean what it commonly means in international law, then it must mean, as the plaintiffs argue and as the district court found, that it means garden variety murder. Any sort of premeditated killing, is that a sensible interpretation to attribute to Congress here? Is it plausible that Congress intended for garden variety premeditated murder to be a predicate act under 1605 capital A? I don't think so. And we outline in our brief one hypothetical, but we could think of many others, where there is a premeditated killing of some type and there's an allegation that a foreign state provided material support for that killing, whether it be the training of a military person, whether it be providing welfare or other financial support by the state. Suppose that a Sudanese soldier, armed as he would be, maybe just a pistol, is in a firefight with someone who has an accident because of action under the statute and kills that person. The material support was provided by the government in arming this soldier. Yeah. That killing, expeditious killing, is it coming within the statute? I would think not. Now, let's put aside for a minute the question of deliberateness. Let's say the firefight was a slow-moving fight where there was a conscious deliberation before the shooting. If that's the case... He's in a garage and he finds this guy and shoots him in the thigh. Okay. I think it's beyond the pale to consider that 1605 capital A was designed to hold a foreign state liable for material support in that kind of a situation. What's lacking? Well, what's lacking is... It's not a state actor acting in the course of his agency or employment, which is a requirement of 1605 capital A. So it's the state actor requirement. So he's not acting within the scope of his agency. Certainly not. If it's a bar fight and he shoots someone, that would not be a summary execution under international law because it's not... If it's, let's call it friendly fire. So he kills the person by essentially thinking he's a terrorist or something. Wrongly. Well, in that situation... Well, I guess it depends. Is the soldier, in that case, acting in the course of his agency and employment? Well, he's supposed to do these things. He just makes a mistake. So you're saying it's not deliberated then? It's deliberated. He thinks this person's a terrorist. It turns out he's an American soldier. Yeah. The final sentence of the definition of extrajudicial killing under the TVPA excludes acts that are not a violation under international law. And I think that there may well be a basis for that to take away that scenario from the definition. What does that have to do with acts of war? Well, maybe. Certainly some acts of war, but also maybe drone strikes and certain other things that arguably may be permitted under international law that constitute deliberated killings. But if it's friendly fire, and let's say it's the assassination of a suspected terrorist, and if the soldier is acting in the course of his agency or employment, yeah, that's an extrajudicial killing. In fact, what's happening now in the Philippines, this is in the papers every day, where there are allegations that the president of the country is deputizing government officials to go out and kill people without trials. That is a classic extrajudicial killing for which a country could be held liable under 1605 capital A if they're a state-sponsored terrorism and designated as such. Let me ask this. Why, even if we use international law and we use Section 2, based on what Judge Bates has found, extensive cooperation between the Sudanese government and al-Qaeda and more than cooperation, giving them false passports, sharing their intelligence, why couldn't you argue that the al-Qaeda individuals under apparent authority of a foreign nation, that is, Sudan? Yeah, well, I don't think there's any allegation in this case that al-Qaeda was acting as an agent for Sudan or any other foreign country. Well, it doesn't say agent. It says apparent authority. Yeah, well, I don't think that's alleged. And Judge Henderson, maybe I can pivot based on your question to the causation evidence. We dispute that there was any admissible evidence linking Sudan or showing Sudan gave material support to al-Qaeda or that any such support was the proximate cause of the embassy bombings. The district court accepted at face value, in full, statements by expert witnesses that were not supported by any factual record. In some cases, the expert statements, there was no basis whatsoever or it was contradicted by what was in the record. Two quick examples. One, and I think these are basically the centerpieces of the district court's analysis. Number one, the statement that there was a letter inviting Osama bin Laden to come to Sudan and that letter allowed Osama bin Laden and his comrades to move around as though they had diplomatic immunity from the country. All three of the plaintiff's experts said that in one form or another in the hearing. There is no basis for that. When one of those experts, Mr. Coleman, was asked the basis for his statement, he referred to the trial testimony of al-Fadl. Al-Fadl's testimony does not support that statement. It does not support that there was any letter to Osama bin Laden or that there was any invitation at all or that the letter gave anyone diplomatic immunity or any other sort of free ride in the country. That assertion was way overblown based on a letter that al-Fadl testified about to a company about import and export rights. Secondly, and critically, Coleman also talked about Sudan providing weapons and explosives to al-Qaeda. And Coleman gave no basis for that. We have scrubbed the record and looked through all of al-Fadl's testimony. There's nothing to support that. So we have expert witnesses speaking without foundation, without any factual basis, the district court accepting that as though these experts were recipient witnesses. Coleman was in high school during the time of these events. He has no recipient basis for any of those statements that he made, and the district court accepted uncritically and without any question these bald assertions by these experts that should not have been admitted under the Federal Rules of Evidence. Mr. Curry, you had submitted earlier in the litigation two affidavits, right? My prior counsel did, but I know what you're referring to. They were submitted in support of a motion to vacate the default judgment. I don't think that's right. No, I'm sorry, they referred to that. They were submitted four years earlier.  And in the reference to the motion to vacate, you say, all told, little if any admissible evidence was provided by plaintiffs to support the court's findings of fact, which you're saying now. Indeed, plaintiff's submissions, for the most part, were no more admissible than the declarations by former Ambassador Curry and former FBI agent Coleman as submitted by Suzanne in the related Owens actions, but not considered by the court. So, are you saying your own affidavits were not admissible either? Yes. And why is that? Well, first of all, under Kim, this court's decision in Kim, any evidence submitted in a 1608E default proceeding has to be admissible under the Federal Rules of Evidence. Those affidavits, like most of the materials submitted by the plaintiffs, did not satisfy any of the exceptions to hearsay under the Federal Rules of Evidence. So we were pointing out that, hey, if you're going to open the floodgates and let in inadmissible evidence, including expert ipsy-dixit, then you ought to consider at least these declarations by percipient witnesses. The statement I read to you was ambiguous in that respect. It reads to say, their evidence is no better than ours, which is inadmissible. The court doesn't say which is it. No, it is no more admissible than ours. But you didn't say ours is as admissible as theirs. Well, if there's ambiguity there, I apologize. But your brief doesn't argue in favor of relying on those. We do not. It's more of a rhetorical point that, again, if the floodgates are going to be opened to inadmissible evidence, then consider that inadmissible evidence too, which is... You have no objection to Judge Bates's having not considered this. It's only that he did consider the other. I think that's fair. I thought in your brief you argued that the judge did not take into account any evidence that lent doubt to what the experts were saying. No, we're not suggesting that the plaintiffs had an obligation to put forward evidence that was exculpatory of Sudan. No, no, no. I'm following up on Judge Ginsburg's point about these two affidavits and also the State Department and CIA reports. Well, we think that the experts' naked statements, without supporting the record... I understand, but I want to just be clear. I read your brief somewhat differently, and you're telling me that indeed you're saying your affidavits also were inadmissible, and so the district court made no error in giving no consideration whatsoever to those affidavits. Yeah. I understand your argument that you're going to look at inadmissible evidence for one side, but you don't have to look at inadmissible evidence for the other side. But I just want to be clear what your argument is about those affidavits. Well, I guess there's a primary argument and there's a fallback. The primary argument certainly is that only admissible evidence should have been considered, the expert assertion shouldn't have been considered, and the affidavits we submitted also should not have been considered because they were not admissible. But if the floodgates are going to open to inadmissible evidence, then the court has an obligation to be even-handed and consider the plaintiff's inadmissible evidence but the defendant's inadmissible evidence at the same time. Is that in your opening brief? I think it is. All right, we'll check on that. Jeff Bates said, look, expert testimony is often not based on admissible facts. That's why you have the expert there. In a case like this, a terrorism case, where you're not going to get ordinary business records from a terrorist organization, there's no practical alternative to allowing in the expert. Well, I have a couple of responses to that. Number one, Kim is pretty categorical in saying that better rules of evidence apply. Number two, in the circumstances here, I don't know why it would have been difficult for the plaintiffs to get actual admissible evidence, given that there were convictions of individuals for perpetrating the embassy bombings. There were four people in federal prison, and there's a cooperator who testified against them, all in the United States. So in the circumstances of this case, I don't understand why there couldn't have been admissible evidence brought forward. And secondly, yes, experts can sometimes rely on inadmissible evidence in rendering their opinions, but a court cannot accept the inadmissible assertions of an expert as the factual basis for issuing a ruling against a defendant. Here, there was, in our submission, quite literally no admissible evidence to support the provision of material support by Sudan to al-Qaeda. None. And experts... So are you saying, in light of Kim, that allowing in hearsay here, expert testimony about engagement facts, is an abuse of discretion? Well, I think it's at least an abuse of discretion, yes. And this is an error of law? Yes, I think it's an error of law. I think it's a failure to apply the Federal Rules of Evidence, which are required not only by Kim, but even in the Federal Rules of Evidence themselves, enacted by Congress, say that they govern proceedings in federal court. Remind me what Judge Bates said about that. Judge Bates said a couple of things. He said, well, first of all, I can rely just on the ultimate opinions. I don't even need to rely on facts. And our response to that is, you can't accept and admit ultimate opinions that have no factual predicate. So we have a fundamental dispute with the plaintiffs and the district court as to the district court's reliance on hearsay assertions by the experts to provide the facts that supported the $10 billion judgment on that issue here. Well, let me ask you something, because Judge Bates didn't just rely on experts. I mean, there are pages going through the whole history of this President Al-Turabi, whatever, and the Khartoum meeting, and then our own government in 1991, and he goes forward from there in the State Department's patterns of global terrorism, how worried they are about Sudan and its growing connection with terrorist organizations. Are you saying that this is tainted as well or that this is not based on facts? Yes, and I'm saying it's not admissible evidence, certainly not, and under this court's rulings, that kind of intelligence reporting is not admissible evidence. And so what is wrong with the State Department's global terrorism report exactly? What is inadmissible about that? That is not a government report based on a duty to investigate and having findings of fact. It is not, there's no exception to the hearsay rule that would allow the admission of that in court. And, Your Honor, I agree that the district court's opinion superficially looks meaty. It's got a lot of pages, it's got a lot of sites. Are you challenging that we put Sudan on the terrorist list? No, not challenging that. But that's a matter of public record. That is an official determination that's admissible in court. But as this court found in the first time that this case was up on appeal, that's merely a necessary condition for liability. It doesn't establish liability. The district court's opinion here, finding liability, finding material support, finding proximate causation, is based almost entirely on assertions by expert witnesses. All of the sites, almost all of the sites in the district court's opinion are to the expert's statements. And when we, in our opening brief, said, they can't do that, they can't rely just on the expert's statements without factual evidence to support that, the plaintiffs could not come forward in their brief to identify any facts underlying the expert's statements. These are paid experts who are asserting, without personal knowledge or any other basis, any other evidentiary basis, facts about Sudan providing weapons and explosives to al-Qaeda. How can an American lawyer, Coleman, testify in federal court to those facts and have that accepted by a court as the basis for a $10 billion judgment against a foreign sovereign? What's your, what is your objection to the admissibility of the TV film showing bin Laden and the president and al-Turabi walking around together? I mean, it's hard, I can't imagine any of us walking around with the president of the United States. Well, you can certainly imagine a big commercial investor having a meet and greet with the president of the United States. Who happens to be a terrorist? Well, when was he a terrorist, Your Honor? The plaintiffs cannot cite any terrorist act by al-Qaeda or by Osama bin Laden predating their residency in Sudan. This country, the United States of America, has a lot of people who live here who later commit terrorist acts. Do we have to point to Fort Hood, toward San Bernardino County, toward Orlando, Florida, toward Oklahoma City? Did the United States provide material support for those acts because some of them were trained military or some of them received benefits from our government? No, that's ludicrous. If your position is that the plaintiffs had to prove that bin Laden was a terrorist before they could bring an action under the FSIA, I think you're totally wrong. Well, I submit that proximate causation has an aspect of foreseeability. I think that's established by the Paraguayan case. I think that's established by the Kilburn case. I think it's established by Rothstein in the Second Circuit. So knowing who you're interacting with is an important part of the proximate causation analysis. Our country did not designate either Osama bin Laden or Al-Qaeda as terrorists until well after he was gone out of Sudan. Sudan kicked him out in 1996, two years before the embassy bombings. How can you fault Sudan for taking measures to expel someone that they suspected of wrongdoing, and then it turns out that they were right? When did you say that they were identified as Al-Qaeda and bin Laden as terrorists? In 98. Before or after the bombings? In 98 and 99. Was it before or after the bombings? Well, 99 was before. It's in our brief, Your Honor. Right. 34. All right, so let me make sure I've got this in order. Bin Laden was supposedly invited there, at least according to the plans expert, in 93? Earlier. Earlier. Right after he left Afghanistan with the Mujahideen supported by the United States. And he's invited out in 96. He's not invited out, he's expelled. And there's conflicting evidence as to whether he was offered to the United States at that time or not. And then in 98, this is the first major successful terrorist attack by Al-Qaeda. Right, and therefore Osama bin Laden and Al-Qaeda are designated by the U.S. at that time. So we have not only faulty evidence supporting material support, but we have an attenuation between that alleged support and the acts that undermine any assertion of proximate causation. Do you have any more questions? All right, we'll give you some time to respond. Thank you, you've been generous with your time, I appreciate it. Okay. Mr. Neuberger? Good morning. Good morning, may it please the Court. I'm Stuart Neuberger. I represent the Americans who were killed in the Nairobi embassy bombing in August of 1998, and I'll address the causation and the extrajudicial killing issues. I'm sharing my time with Mr. McGill, who will address the other issues that affect both American and non-American victims and their families. One issue that was not brought up by Mr. Kern, but I think is critical... No, no, I'm clear. I'm sorry. Are you making any distinction between citizens and non-citizens? No, not as part of my argument. No, no. I was just outlining who's going to address what issues. I'm sorry if that was confusing. I'm sorry, you were speaking on behalf of... My clients are, sadly, the Americans who were killed in the Nairobi embassy bombing in August 1998. One issue that was not discussed by Mr. Kern, but which we think is critical for this Court's role of reviewing all these years of Judge Bates's hard work, is that Sudan made its first tactical decision in the underlying litigation to appear in the original Owens case after its initial default and then made another tactical decision, a deliberate choice, to then come into the case and litigate a number of issues, both in front of Judge Bates and this Court in the first Owens appeal. And then it made another tactical decision to walk away from the litigation, apparently not satisfied with this Court's affirming Judge Bates' denial of its sovereign immunity jurisdictional defense, until it made yet another tactical decision to come back into the litigation and raise, at the very end, after Judge Bates had decided liability, after he had spent a lot of time with special masters calculating the individual victim and family members' damages, and then they made another tactical decision to take appeals to this Court, even while they were litigating the vacator request before Judge Bates. Was the District Court obligated to examine your challenges to the ambassadors affidavit, explaining to them what you call walking away? In looking at how that was raised, as I believe one member of the panel noted, Sudan brought in those two affidavits in its first entrance into the case 10 years ago, 12 years ago. Excuse me. I'm referring to the affidavit attached to the motion to vacate. Yes, I'm referring to the... Are you talking... There's the ambassador's affidavit. I'm referring to the ambassador's affidavit explaining what was going on during these years. I misunderstood your question. I thought we were referring to the earlier affidavits. I apologize. The ambassador's affidavit was essentially submitted to support the excusable neglect position that Sudan took for a vacator. And Judge Bates, in I believe an area where he enjoys broad discretion, ruled that considering that affidavit from His Excellency, there was not grounds to vacate for excusable neglect. That was essentially the question. So my question to you was, was the District Court obligated to examine the affidavit since it was before him and it made assertions? And your argument today about Sudan's motivation, et cetera, certainly is contradicted by that affidavit. And my other question is, did the District Court have any obligation to examine the assertions in the affidavit? I think it was... I'm sorry. That's true. I think that he did what he is required to do under Rule 60. He examined the affidavit. He compared it to the standards for vacator on 60B1, which is what most of that was. The District Court cited two congressional resolutions in 2006 and 2007. He had the motions by various councils to withdraw because of problems with communication. He knew that there was no working email system in Sudan at the time according to Sudan's council. There was a letter in 2008 of an inquiry, but we have no idea what that was about or anything. So I'm just trying to understand in that context whether the District Court had any obligation to inquire. Well, if the question is what was going on with Sudan, I would note, and you can judicially notice this because it's well known, at all relevant times for this entire period, for 14 years, the United States of America and Sudan have enjoyed full diplomatic relations, and Sudan has had an embassy here in northwest Washington every minute of every day for that entire time frame. There was no allegation like this is Iran or as we saw 10 years ago with Libya where we had no diplomatic relations. We had full diplomatic relations. That's not the issue, counsel, and you know it. My question goes to, I mean, hypothetically, the United States is engaged in a civil war. There is litigation against the United States pending in France. How much attention was the United States government paying to litigation in France, notwithstanding that at times there were lawyers in the case? I'm just trying to understand this situation, and the ambassador paints a picture that is quite different from the District Court's findings, and ultimately, as I read the District Court's findings, it is that he received neither an email nor a letter. Now, my question is, the District Court wasn't, I suppose, assuming Sudan was going to contact him personally, but these lawyers should have alerted the District Court. Is that what the District Court was getting at? Well, I don't know what was behind Judge Bates' thinking. And that's my point when you're saying tactical decisions were made by Sudan. Do we know on this record? That's all I'm trying to understand. Yes, we do know a lot, and that, I think, is the thrust of my presentation to you, Judge Rogers. We know what they did, and I might add, after this court affirmed the denial of sovereign immunity in Sudan, for whatever reasons, good, bad, or indifferent, decided to not participate in the merits or in damages, we know Judge Bates did do one thing back in 2011. After he issued his extensive findings on liability and material support about the embassy bombings, he made sure that that ruling was translated into Arabic and served by the clerk of the District Court to the State Department and through diplomatic channels to the government of Sudan. We know that was done, and that's in the record. So there could be no excusable neglect if a party is actually served. That is correct, and that's one of the bases that Judge Bates found. He, of course, relied on several. He also made the point in his vacators denial that whatever reasons Sudan may have had that were of a temporal moment legitimate certainly were no longer available to them over that great extent of time, particularly when they were talking about, well, we had floods in a certain year or we had certain issues. Of course Sudan and later South Sudan have experienced some very traumatic episodes. But Judge Bates looked at the entire time frame of the litigation, and he examined carefully the reasons that were put forward by the ambassador on the vacator motion, and he said there's no basis for me to say it's excusable. So was he finding that the ambassador made false statements? No, and he did not need to make a finding that it was a false statement. The burden on Sudan, and of course under Rule 60b-1 the burden is solely on Sudan, was to demonstrate through proper evidence that there was inexcusable neglect, not just negligence. It has to be excusable, and Judge Bates's careful consideration of that affidavit and the entire record of 14, 15 years of in and out, and in and out, was the basis for Judge Bates saying I am not going to vacate these judgments. So I don't mean to belabor that point because I know there are other issues pending before the court, and if I may, I'd like to briefly touch on causation. Well, before you do that, could you respond to your colleague's argument about the definition of extrajudicial killing? Yes, certainly. I was going to do that second, but I'm happy to do it first. I think it's very clear this is a situation where Congress has provided one exclusive way for victims and their families to bring claims against state sponsors of terror like Sudan. Remember, it has been on the terrorism list for providing material support for terrorist states since 1993, officially and formally, as this court noted in the first appeal. But more importantly, with regard to the mechanism that we use to bring claims against states in the district courts, the plain language of the FSIA makes clear that the only part of the TVPA that is relevant to this statutory construction issue is the Section 3 definition section of the TVPA. And Mr. Curran, both below and here, has attempted to import into the Foreign Sovereign Immunities Act a provision, Section 2 of the TVPA, which is clearly not what Congress even referred to. And I believe, Judge Henderson, you said a little while ago, if Congress had intended to, they know how to. If Congress had wanted to import into the FSIA Section 2 of the TVPA, it could have. But there's a very good reason why it didn't. The TVPA is pursuing individuals. The FSIA is pursuing sovereign states on the end of the year. In this regard, terrorist states listed by the Secretary of State. We are talking about entirely different legislative vehicles for pursuing claims in the district court. That is why, under a plain language reading of both the FSIA, whether the earlier version or the 2008 version, it doesn't matter. It's the identical language. And I'd remind the Court, we are here, and we have proven, at least to Judge Bates' satisfaction, not that Sudan drove the truck into the two embassies in August 1998. Our job was to allege and then prove that it provided material support to al-Qaeda when al-Qaeda drove these trucks with the suicide bombers. That is the evidence that we relied on, and that is the evidence that Judge Bates relied on. This is not a case of where we even allege that Sudan carried out these horrific attacks. And I think that's the big difference between what I'm putting forward and what Mr. Curran put forward. I hope that answers your question, Judge Henderson, on the statutory interpretation. I might add, I think Congress would be shocked to even have a sense that attacking the United States embassies is somehow not an extrajudicial killing. In 1996, when it also enacted the Flato Amendment, which was about the bombings, Congress also had already noted that the 1983 attack on our embassy in Beirut was one of the grounds for passing the 1996 Terrorism Amendment. That is why we're confident this is what Congress meant. Now, with regard to causation, I think what's very clear is Mr. Curran has made an argument about the experts and no facts. I would remind the Court, and it's extensively discussed in the trial transcripts and two times by Judge Bates, 2011 and 2016, Mr. Simon, one of the witnesses who testified, was employed at the National Security Council at the White House, and his job was to work on terrorism issues that were directly relevant to his testimony before Judge Bates. He was not some law professor brought in or a lawyer who didn't know anything. This is someone who was a recipient witness as well as a qualified expert, which Judge Bates points out in detail in his findings in 2011 as well as 2016. Can I make—I'm sorry. Is the word recipient a term of ours here? Well, it's been used by Sudan. That's why I'm borrowing it with permission. I would say it's more—some of it was first-hand knowledge. Well, what does it mean? Does it mean I've read a lot of books? No, I would think it's closer to having first-hand knowledge from your work and from your life experience as comparing to studying the work of others. And Mr. Simon— Well, there was some suggestion in the district court that it had— I mean, I looked the word up because I wasn't clear what it meant in this context. We're not talking about eyewitnesses necessarily. No, no, Mr. Simon was not in Nairobi when the bomb went off. That is correct. But we are speaking of people who either infiltrated or had some direct knowledge of as opposed to mere, and I say that in quotes, scholars. Correct. And Mr. Simon clearly falls into the category of someone whose job, his professional duties were working at the National Security Council at the White House on these issues during this relevant timeframe. But I think the argument, if I understand it, is that his analysis is as good as the information he is receiving. Yes, and my point is he was receiving this in real time at the time of the relevant actions by Sudan leading up to and after the bombings. I'll also add, Judge Bates relied on a declassified document from the Central Intelligence Agency from 1997, after Mr. Bin Laden was expelled or however he left Sudan to go to Afghanistan. That document, which was declassified, makes clear that Sudan was still supporting terrorist groups such as al-Qaeda. And the fact that the 98 bombings were their first, quote, and I hate to use this word, successful, quote, operation because it was devastating, one of the most devastating attacks on the United States until 9-11, by the same organized gang, I might add, three years later. And Sudan was determined by the CIA after Bin Laden left to still be supporting al-Qaeda. They cannot walk away from that. Try as they might. That evidence is unrebutted. And when Sudan made a decision not to challenge that evidence, either at a trial, after this court had first denied their jurisdictional defense, or after Judge Bates had it served on them through diplomatic channels, they had a second bite at the apple. They chose not to take it. And then they come in after the damage awards and the judgments, some of which were final, some of which were not yet final, and took appeals, of course, from the judgments that were final. I understand the record is undisputed. But they can't now complain, having made those choices, that somehow there should be a do-over. I might add, they have not informed Judge Bates, and they certainly have not informed this court, and they have not even made a proffer as to what kind of evidence, what kind of hearing they want. They just want to start over. And the rules don't allow that. What you said about Mr. Simon's basis for knowledge of the facts to which he testified, is that any different from the background for the declarants whose affidavits were not discussed by Judge Bates in the final two affidavits? You're talking about the earlier Sudan affidavits, the FBI ambassador? Yes. I point out, and of course it's in the record, that at the time that Sudan submitted those affidavits of former federal U.S. government officials, it was a contested proceeding. And the plaintiffs and their lawyers objected in a real contested case, not in a default situation. And Judge Bates upheld that objection. I thought he simply said he wasn't going to rule on it now. No, he actually...  I couldn't find a ruling on it. And when he later refers to it in the 63 opinion, he does say that he has ruled it out. Well, with respect, I know from the record, way back in 2004, when Judge Bates did two things, and it was in light of this Court's decisions in Kilburn, as you may recall, because the jurisprudence and the pleading standards were being developed by this Court's jurisprudence. It was clear that Judge Bates did two things. He told the plaintiffs, I want you to amend your complaint with more particularity. And he also said that the two affidavits submitted by Sudan in support of their motion to dismiss were inadmissible because Sudan had not complied with the TUI regulations. You cannot have former U.S. government officials come into a nongovernmental case and testify about anything from their own experience in government service unless the administration says it's okay under the TUI process. This is well known and has been litigated in this Court and many other courts. And that was the basis for him saying, I'm not going to admit it. But he also said, I'm not going to allow the plaintiffs to depose me. I'm sorry, I didn't mean to interrupt. Perhaps you could provide us with the record. We shall do so as soon as this hearing is over. Senator Berger, in the King case, the Court concluded its decision by saying, given these uncontroverted expert statements, we have no trouble concluding that the Kings presented sufficient evidence. An observation about our decision to reach, our conclusion would no doubt differ if we lacked confirmed evidence that the DPRK was involved in the Reverend King's disappearance. So the abduction of the victim here was, there's no question about that. Correct. And the only inference is, what happens if someone is abducted to the North? Well, and it was all about inferences because no one actually knew in fact. Right, right. But what is the predicate fact here, if there is one, that you can identify that similarly, just the ball rolling gives the District Court confidence that the experts that you put in are making logical inferences from something that's undisputable. Yes, well I think, pardon, I touched on this before, but I think from a logical sequence, it makes it simpler to start with 1993, which this Court, of course, looked at in the first Owens appeal, when the Secretary of State, pursuant to the President's authority, put Sudan on the list of terrorist states. And the specific reason for that, the specific reason in the Secretary of State's designation, was that Sudan was providing material support to terrorist organizations. So Sudan has been on notice long before these attacks took place, long before there was a litigation, long before the 1996 FSIA terrorism amendments, that as far as the United States of America is concerned, officially and publicly, our President is saying, you are a terrorist state, and you are providing material support to people who want to kill Americans and hurt Americans. And then the evidence that Judge Bates considered post that designation, if you will, and I know there are three categories that he considered. There's the three witnesses, two of whom I would call as pure experts. Mr. Simon, I think, is a hybrid, given his personal knowledge from the White House and the NSC, as well as his being qualified as an expert, because, of course, that allowed him to provide an opinion, not simply knowledge, but opinion. And the District Court treated him as an expert. The District Court, yes, treated him as an expert, but also the only step, as we know under Daubert, is that the District Court must make a particularized decision that he's qualified to be an expert. You're trying to reclassify him. That's all I'm trying to be clear. The District Court treated him as an expert witness, both during the proceedings and in denying the motion to make it. He treated him as an expert because, under Daubert, he must, in order for there to be a conclusion provided. But Judge Bates, in his 2011 merits liability decision, also repeats, if you will, some of the factual knowledge that Mr. Simon had, and I don't have time, of course, to go through this. Mr. Simon testified for several hours, and the transcript is a part of the record. He testified about his knowledge, and he was also authorized by the District Judge to give an expert conclusion. So, yes, the District Court did consider him an expert, and I believe that's a sure thing because he has to. But he also heard direct testimony from Mr. Simon, and I might add, that testimony, as well as the two other, I'll call true expert testimonies, were corroborated by the CIA declassified documents, and most importantly, by the State Department's annual reports, which, by the way, it is required to issue through the Secretary of State every year. This is not some random correspondence that the executive branch does, you know, willy-nilly. This is by statute and regulation that the State Department issues these every year, its annual report on terrorism, global patterns of terrorism, and those are specifically reliable as federal government reports because they are required to be issued on this subject. In reading Judge Bates' decision, I understood his questions with regard to Mr. Simon's knowledge were all in regard to whether or not he should be qualified as an expert witness, and then the District Court allowed him to give his opinion. So, a typical Daubert inquiry. What I guess we're asking about is the fact that an expert says, I know A, B, and C, and therefore I have an opinion about the causation of A, B, and C. At least the way I read our cases and the federal rules. That's not the same as proving the existence of A, B, and C. Well, of course not, and we're not arguing that solely the expert opinions are the factual foundation for Judge Bates' ruling. We're relying on Mr. Simon's qualifications and the CIA declassified report and the Department of State's annual report. All of those, and in addition, the FBI and the Department of Justice managed to turn Mr. Feigl, one of the critical links in the Al-Qaeda-Sudanese relationship directly at issue here in this case, as well as the criminal prosecutions of the same gang in New York for these bombings. And Mr. Al-Feigl's testimony in the criminal cases was introduced here as additional corroborative evidence, and if Sudan had been in the trial, if it had made the decision to contest the evidence, it would have had an opportunity in 2010 to come in and say, that's inadmissible, or we want to take his deposition, or we want to cross-examine him, and they did not. So they can't now complain about their own decisions, and that was what Judge Bates pointed the finger at Sudan and said, it's too late for you to make those kind of arguments here. They had many opportunities, and Judge Rogers, just to follow up on your point, after the 2011 liability and merits decision was served in Arabic on Sudan through our diplomatic channels. Sudan had an opportunity in 2011, 2012, right up through the time that the cases were over. It had every opportunity, and His Excellency's, the Ambassador's affidavit does not even discuss why they failed to do that. So my question is, since it doesn't, was the district court required to make some inquiry? No, because the burden is on Sudan. I know, but I'm just trying to understand, you want us to accept these reports and other matters, and yet here we have an affidavit, or was it a declaration, a sworn statement, that makes certain representation, and if they're true, that casts one light on things. If they're true, then there needs to be evidence to support them, and the district judge, in the first instance, has an obligation under Rule 60 to figure out if there is enough evidence to excuse the neglect. Not was there neglect, but is it excusable neglect? Right, we're discussing at cross purposes here. So there was no obligation, in your view, for the district court, if it was going to reject the Ambassador's assertion, to inquire either of the Ambassador or of the moving party? No, Judge Bates, I think, fully complied with the requirements of Rule 60, and fairness required, and I don't think there's any duty on him to go beyond that and say, I want the Ambassador to come in here and be cross-examined by me or by the other side. There's no obligation on him whatsoever, either under the rules or under the FSIA, and so I believe he did do what the rule required, and I might add, Judge Bates bent over backwards as far back as 2004 for Sudan, when they first came back in the case. He's twice said he complied with the rule, but the rule doesn't answer the question I'm asking. So, in any event. With that, I know my time has expired, and I appreciate the court's patience. I'd like to ask you about the standard for evidence satisfactory to the court. Yes, yes. What's your position on that? Yes, well, of course, we have defaults that we're all familiar with in a private setting, and then we have defaults under the Foreign Sovereign Immunities Act, and we know that Congress effectively has instructed the district judges what to do when a sovereign, for whatever reasons, excusable or not, is not present at the time it wants to enter a judgment. And when Congress enacted the Foreign Sovereign Immunities Act originally in 1976, 1608 was effectively a part of the scheme that Congress had put together. And what that does, it provides sovereigns extra insurance, extra protection, that instead of just a default and everything is considered acceptable from a factual and evidentiary basis, the district judge has, if you will, an additional obligation because of principles of comity and because of the principles that Congress was addressing when it first enacted the law in 76, to bend over backwards for sovereigns, to make sure, if you will, that there is evidence to support the entry of a default judgment, not simply rubber stamp it as might happen in a commercial case or a contract case or something like that. What I was asking was, is it more than preponderance of the evidence? Is it preponderance of the evidence? Is it less than preponderance? The burden of proof, I'm sorry, I misunderstood. I thought your question was about the statute itself. The burden of proof is clearly, like any other civil case, is preponderance of the evidence, and I think that's been accepted by this Court and the district courts in many of these FSIA cases. I hope that answers your question. With that, I would like to defer to my colleague, Mr. McGill, who will address the other issues, and thank you very much for your patience. Good morning, Judge Henderson, and may it please the Court. I'm Matthew McGill. I represent all of the other plaintiffs here before the Court today. Judge Henderson, I have a different view than Mr. Neuberger on the standard under 1608E. I think it's at most a substantial evidence inquiry. It doesn't make sense to talk about a preponderance of the evidence in a non-contested proceeding. Judge Rogers, you asked about a record site for the rejection of the Clooney, or I keep calling it the Clooney, the Clooney and Carney affidavits. Yes. It's not exactly perhaps what you're looking for, but page 142 of the joint appendix discusses what happened in the district court, and what happened there was after Sudan submitted the affidavits, the plaintiffs sought to depose the declarants, and Judge Bates recognized that there was a 2E regulation problem on both sides. The plaintiffs could not depose the declarants because the plaintiffs had not complied with the 2E regulations, and he also recognized at that time that the declarations were submitted without compliance of the 2E regulations. What happened was Judge Bates said, I don't need to go any further than that. I'm denying your motion to strike the affidavits, but I'm also denying your motion to dismiss Sudan. So once that happened, Sudan took an appeal to this court, and, of course, this court affirmed the denial of the motion to dismiss, and that kind of put those affidavits to bed, and they were never heard from again until Sudan filed its Rule 60P motion. I hope that clears it up. Yes, but that's all I found. And I think that, in truth, is all that occurred because nothing else needed to occur because after this court affirmed the denial of the motion to dismiss, Sudan walked away from the case. But you agree the district court referred to them later on. The district court certainly – the district court, in its denial of Sudan's original motion to dismiss, specifically held that those affidavits were not enough to overcome the testimony of al-Faidal and al-Risi, which is the backbone of the evidence that supports the 1608E findings here. And I know causation is not my issue, but I will just point the court to a couple of things. I just ask you to repeat, not enough to overcome the testimony of? Of Jamal al-Faidal and Assam al-Risi, and these are two former al-Qaeda members who became cooperators for the government who testified in the 2001 embassy bombing trial before Judge Sand in New York. This was the backbone. This case has much more evidence than the average terrorism case because you have the guilty plea of Ali Mohammed, who was a lead conspirator in the event, and you have also the cooperating testimony of al-Faidal and al-Risi. Now, what did they testify to in the proceedings in 2001? I want to make clear what we're talking about. In the embassy bombing trials, al-Risi said that the Sudan military protected Osama bin Laden in Sudan. He was a former pilot for Osama bin Laden. The district court discusses that at Joint Appendix 401. He also discusses at 401 Jamal al-Faidal's testimony that Sudan provided hundreds of passports, hundreds of passports to al-Qaeda while they were in Sudan, and those passports then enabled al-Qaeda members to travel to the Nairobi cell without any difficulty and to plan and carry out and perpetrate the attacks. Any doubt about that is removed by the guilty plea of Ali Mohammed, who personally scouted sites in Kenya and then selected the targets with Osama bin Laden himself in Khartoum, and that is at Joint Appendix 335. The experts here relied on that guilty plea, that sworn testimony in district court, and their experience and, frankly, expertise in this subject to reach conclusions and opinions. This court in Simpson, Judge Rogers, it was your opinion, I believe, in Simpson. Actually, it was for the court. You're correct about that. Your opinion for the court in Simpson says that, speaking of another expert, it was consistent with the requirements of federal rule of evidence 703, which does not require independent evidence nor limit an expert to consideration of admissible evidence informing an opinion. That's 470F3 at 362. Well, that's not the issue we're addressing here. The appellants have not challenged in a direct sense the qualification of the experts. Well, I think that what they are challenging is the basis for their opinions. And I understand that what they're challenging is the use of the basis for their opinion as factual evidence, and I thought the thrust of your argument now is that's not correct. And even if they did, there was this other record evidence. I think all that's true. I read Simpson for the proposition that under the federal rules, an expert can form an opinion based on more than merely evidence that is otherwise independently admissible. That's not the issue in this case. Okay. Well, I understood Mr. Curran to raise that issue front and center. So I think it's also important to put this within the correct framework, which is the burden of proof here to establish immunity rests with Sudan. That is confirmed by this court's decision first in Phoenix Consulting and later in Kilburn. We had, as plaintiffs, a burden of production, perhaps, to demonstrate that there was the exception to immunity existed, but they had the ultimate burden of persuasion. Judge Page held in 2008 in denying the original motion to dismiss, that the testimony of al-Faidal and al-Risi satisfied our burden of production. This court affirmed that decision. And since then, we have come up with not just the testimony of al-Faidal and al-Risi, but now also the testimony of three expert opinions to further advance our burden of production. And Sudan, for its part, to counter our burden of production, to meet its burden of persuasion, has put forward nothing. I think that is sufficient to end the inquiry as to jurisdictional causation. But if you wanted to go farther, Judge Bates' factual findings here, Sudan acknowledges at page 15 of its brief, are subject only to clear error review. Their admissibility quarrels do not constitute an allegation of, much less proof of, clear error as to Judge Bates' factual findings that, for instance, Sudan provided passports that were essential to the carrying out of these attacks. There is no allegation of clear error here, much less evidence or proof that would be necessary to overcome and establish that the district court's jurisdiction was lacking from the outset and that the judgment is void. This court's opinion in Gates v. Syria establishes beyond her adventure that it is Sudan's burden to demonstrate that the court lacks jurisdiction. It did nothing to carry that burden on the causation issue. What it did was submit the evidence of its ambassador. And Judge Rogers, you raised questions about this as well. Paragraph four of the ambassador's declaration, I think, is carefully worded. And what it says is that from 2005 until 2014, Sudan was not in active communication with the U.S. Council and was absent from the litigation in the United States. We can take that as true. But what it says at the bottom was that events in Sudan, specifically the session of South Sudan, completely preoccupied the government of Sudan and necessitated the diversion of all legal and diplomatic personnel to that process, meaning the succession process. What is not in that affidavit is any statement that Sudan could not, possibly, was unable to, was somehow blocked from, participating in communicating with the district court. This is miles away from this court's decision in FGE Hemisphere, where this court recounted in great detail how the package that served the Congo government went through this, it was stuck in the mail for several days and then went through this elaborate bureaucratic process. We didn't set up a standard of blockage there. Let me ask you, are you going to, do you represent the family member claim? I do. All right. Do you want to discuss the presence requirement under the D.C. Court of Appeals? Absolutely. Intentional infliction of emotional distress. So the first point about that is that this is conceitedly forfeited. This is undisputedly a merits question that could only, that does not go to jurisdiction and, therefore, relief only could be granted if this court first found one excusable neglect or somehow extraordinary circumstances under 60B6. I submit that this, for reasons that I can elaborate on, that Sudan doesn't come close under either the pioneer standard, which governs excusable neglect, or this court's opinion in Salazar, which talks about the extraordinary circumstances. It doesn't come even remotely close, but addressing the merits of your question. This court in Venice in 2003 determined that the standard that governs claims brought under the federal cause of action, or so-called federal common law, was section 46 sub 2 of the second restatement of torts, which is the same substantive law that all parties agree here governs in the D.C. Court of Appeals. So the question here is whether family members who were not present at ground zero can obtain relief under that section of the restatement. This court in Venice at least approved such an imposition of liability under federal common law. It has been repeatedly approved under federal common law in district courts. You're suing under D.C. law a state claim for intentional infliction of emotional distress. Is that correct? Some of the plaintiffs are. Those who are not U.S. persons or are not otherwise connected to U.S. persons. So that is correct, but my point... Okay. The answer is yes. Yes. And that is a tort, correct? Yes. And the way the District of Columbia Court of Appeals has interpreted it, it has a presence requirement. Is that correct? No. And what case can you cite for that proposition? I think that what the D.C. Court of Appeals has said is that the restatement, we look to the restatement second, section 46 sub 2, which does include a presence requirement, but also includes this caveat, which allows for development of the law. So do we need to send this question to the D.C. Court of Appeals? No. Why not? Because under the governing statute, it has to be determinative of the cause, and this is undisputedly forfeited and cannot be... But we were into the merit. We were, but my first line is always going to be, this is forfeited. You don't need to reach it because you have to go through the 60B1 or 60B6 gate first, and they can't get through that. But I'm trying to be helpful in addressing the question on the merits as well. I don't think the certification is appropriate. I do think that it would be truly anomalous if every district court in this building, which is applying the very same restatement provision to identical claims in the very same cases, finds liability is available for people not at ground zero under federal, quote-unquote, federal common law, but not under D.C. law. But I didn't find any D.C. Court of Appeals case resolving this. I think that's... Much less any case from this circuit resolving the question. So your point is the only way appellants can get there is through Rule 60B. I think that's correct. They have made an argument. They have cited in their brief a case I believe is called Marshall v. Bagot, that they cite for the proposition that in any default judgment, you can challenge the legal sufficiency of the complaint. I would say to the court in response to that, anticipating the reply, two things. One, this court's decision in practical concepts is governing, and it says that you forfeit your opportunity to defend on the merits when you walk away from a case as Sudan did. And second is that in Marshall v. Bagot, that was a case in which the plaintiff truly had no opportunity to defend and never defended, which is quite apart from what Sudan did here. Sudan filed a motion to dismiss. This argument could have been included in that motion to dismiss. It was not. And then this court affirmed. So Sudan had its fight at the jurisdictional apple, had its opportunity to make this argument. Marshall v. Bagot doesn't apply. Forfeiture rules in this court's decision in practical concepts does. I think because they're so important, I do want to turn back to the 60B1 and 60B6 gates. The 60B1 gate, excusable neglect. This court looks to the Supreme Court's decision, the quote-unquote pioneer factors. The first of that, one of those factors is the length of the delay. Here, the length of delay is truly extraordinary. We're talking about, you know, several years, years-long delay. Well, when are you starting to count the delay? Well, I would count the delay. It depends on what case you're talking about, of course, Judge Rogers. But in the Owens case, I would start from the day that Sudan, from basically the day this court affirmed the denial of the motion to dismiss, I think was the last day Sudan said to have been participating, which was, you know, now seven years ago. Well, let's see. The district court's final judgment on liability was November 28, 2011. Damages was March 28, 2014. Is that correct? Correct. All right. New counsel enters April 28, 2014. Remarkably on the... cases where the district court had already entered a final judgment and then proceeded to file in the other four cases once the final judgments were entered. So that's a month's delay. But I think that measures it from the wrong starting point. Well, I'm just saying there's a final judgment and then there's an appeal. So you think we should go back to the motion to dismiss and this court's first appeal? Well, I think the question is when should Sudan have... How much neglect is Sudan looking to excuse? When should it have raised this argument? I'm just trying to understand. And counsel was still in the case for Sudan until the district court in January of 2009 allowed counsel to withdraw. That's correct. All right. Counsel had filed the motion to withdraw much earlier, explaining to the district court the problems with communication. Not that there was any disagreement, but that counsel was unable to contact, reach, discuss, however you want to describe it. So would you start the delay from the point that counsel is allowed to get out of the case? I think the relevant time to start the delay, in all fairness to Sudan, would be the last moment at which it should have raised the argument that otherwise would have been forfeited. And I think that really plausibly here could be only the date of the 1608E trial. So I would take it back to the 1608, the date of the 1608E trial, which was five years ago. This is many, many multiples of the delay at issue in the FG hemisphere. The prejudice to the plaintiffs here is many magnitudes greater. But I do want to take issue with the assertion that the neglect here was in any way excusable. I would note that this is not the only jurisdiction in which Sudan has cases pending against it. The cases concerning the bombing of the USS Cole are pending before the Eastern District of Virginia in front of Judge Dumas. The district court didn't rely on that. No, it didn't. But I think it's certainly relevant to this court's determination about whether the neglect was excusable. And the point was... We don't know. I don't know what's happening before Judge Dumas. I mean, there are many cases filed against many defendants. That was not the district court's point.  You are correctly restating the district court's analysis. No, that's his opinion in denying the motion to mediate. Yes. He said more than that, of course, but you're correctly reciting what the district court relied upon. He thought that it was quite literally incredible. Quite literally incredible. He said he had a blame argument, and he said, but ignoring any blame here, I didn't even get a letter or e-mail. Well, here's what I was going to say, and you may choose to take judicial notice of it or not because it's a proceeding in another jurisdiction. Did you ask us to take judicial notice in your brief? I have not. You know, I have no idea what's happening with those other cases. On September 3rd, Judge Dumas recounts in an opinion. You're trying to introduce something new, an oral argument. I mean, you haven't made this argument, and the district court didn't rely on it. The argument we've made, Your Honor, is that Sudan's neglect is inexcusable. It has no footing under this court's pioneer factors. Sudan has participated in litigation in other jurisdictions while claiming to Judge Bates that it was impossible to do so. I think this court can take recognition of that. I think this is quite serious, Candidate. I mean, I guess your position was that the district court did not abuse its discretion in denying the motion to vacate, and it set out in some detail the reasons for its decision. Not that the district court's decision was somehow insufficient and has to be bolstered by facts of which this court should take judicial notice. That certainly is correct, that there is nothing deficient about Judge Bates' projection of this argument whatsoever. Under this court's decision in Gates, it was Sudan's burden to demonstrate that its neglect was excusable. It's the affidavit with nothing more. Paragraph 4 of the affidavit found at 648 of the joint appendix doesn't say that much. It just says that Sudan is otherwise completely preoccupied. For nine years was what Judge Bates' point. They could not even say that they had requested an extension of time. There's nothing in this court's cases that even remotely supports that rising to the level of excusable neglect under the pioneer factors. Certainly not this court's decision in FG Hemispheres, which involved a much, much shorter delay with no prejudice to the plaintiff at all. This would be enormously prejudicial. This case was filed initially in 2001. So what do you think the district court was saying was counsel's obligation on behalf of its client prior to the time the district court allowed it to withdraw? I don't think Judge Bates was quarreling with the counsel's conduct prior to the withdrawal. I think he was quarreling with Sudan's refusal to communicate with its counsel. You said we should put aside the 8th Circuit's Bagot case, and there are some others that are similar. In fact, we've not heard about that in person. And you said to be governed instead by practical concepts. And I'm looking at that and the footnote in practical concepts that says the United States in its amicus brief cautions the court about being too rigid. I think this word was intolerant. It's an intolerant appearance to default judgments against foreign states because of the possibility of implicating foreign relations. Now, that suggests to me that if you're correct, that even if you're correct on the pioneer factors, it would be prudent before imposing multibillion-dollar liability on the government of Sudan to refer this merits question to the DCCA. Do you have any reason to think that that would be imprudent? Yes, I do. I mean, I think that, first of all, it would, as I said, under the governing statute, it must be, quote, determinative of the cause. So because the issue is forth to me, I don't think it possibly can be determinative of the cause. This is undisputedly a merits question. That's exactly the rigid appearance or intolerant appearance to which the government is in charge. Well, I think that the rigid intolerance, so to speak, to use your words, is a question of Rule 60 and what Rule 60 requires. Rule 60 has a safety valve under 60B6, and it has a safety valve under 60B1. This court has exercised it in appropriate cases. I take your point. Suppose the DCCA had already ruled and said that the potential infliction clause of action does not extend to a non-present plaintiff, and the district judge overlooked that, just wasn't aware of it, or thought it was important, just wasn't aware of it, and reached the same conclusion as reached here. And would you say we could not correct that error of law because we couldn't get past the pioneer factors? Well, I don't think it would be a pioneer question. I think it would be a 60B6 question, and I think this court actually… Which of the two elements of 60B6? I'm sorry. I'm sorry. Go ahead. I think it would be a 60B6 question, and therefore what? I think this court squarely addressed that in Salazar. I think it says in terms in Salazar that the mere error of law is not enough under 60B6. There's a Supreme Court case to… I don't remember Salazar. Is that an FSA case? No, it is not, to my understanding. So there's an implication of foreign government or the relations of foreign government? No, no. It's a little 60B6 case. I understand. And it's about what constitutes extraordinary circumstances. And the extraordinary circumstances in that case, in discussing the standard, this court said that a mere error of law without more, correction of an error of law without more is not enough. And about $4.3 billion is the more. And as Judge Bates said, you know, the fact that it's a consequential error of law itself is not enough. What this court has said is required for extraordinary circumstances is some form of really a disability, either a disability that essentially renders you incapable of litigating the issue, as was just the name is escaping me, but the Supreme Court case that approved 60B6 relief involved someone who was literally incarcerated while they were served with denaturalization proceedings and literally could not participate. We hear these questions from incarcerated persons all the time. Yeah. So the point was that… They don't seem to be disabled. Well, I suppose under the facts of that particular proceeding, the Supreme Court found that it was. The point is that under Rule 60B6, it's a very, very high bar that this court has set. And a mere error of law isn't sufficient to meet it. But I think more importantly, there is no error here. The standard under the restatement is it expressly allows for this kind of development of the law, as it says. It has that giant caveat. Every district court in this building that has applied it has found that it applies to family members who are not at ground zero. Of course, that's just a matter for the highest court in the District of Columbia to decide, isn't it? You're suing under D.C. law. I don't think certification is appropriate for the reasons I elaborated. It's not determinative of any cause here because of the forfeiture. I understand what you are saying. I also think that there's no reason to think that the D.C. Court of Appeals would look at this any differently than every district court in this building when they apply the same legal standard, which is Rule 46 sub 2. That may not be the argument you want to make to the D.C. Court of Appeals. It may not be. I acknowledge that. What I would point to the D.C. Court of Appeals is that there are very few cases that consider this other than under federal common law. Because the terrorism cases, what we're talking about is an act of terrorism. My only point is we have a lot of district court decisions, you're telling them, but they haven't been reviewed. Well, Bettis was reviewed, but Bettis reserved the question. Bettis said we're drawing the line at family members under federal common law. We're drawing the line at immediate family, nieces and nephews, but it expressly reserved the presence question. So it's not for, you know, lack of opportunity. I don't think this court would in any sense be going out on a limb, however, in recognizing that acts of terrorism by their very nature are intended to inflict emotional distress beyond ground zero. I think that's true, but they're not directed at any specific individuals. I mean, the point of a terrorist act is to terrorize the public, not just to kill the victims. And I think Judge Rodgers was going to ask a variant of the same question, which is, well, then can't everybody recover? And the answer to that is no, as this court explained in Bettis, that we draw the line at the immediate family, because that is a separate requirement. Under common law. All right? That's all I'm trying to get at. Well, under the restatement. Under common law, yes. As a matter of federal law, yes. Federal law construing the restatement second, which it's important to understand why did this court select the restatement second. It's because it felt it was bound to do so by rules, by section 1606 of the FSIA. I think it understands also that the D.C. Court of Appeals often follows the restatement. I'm just getting at the point that I thought a critical part of your case was your ability to recover under D.C. law for intentional infliction of emotional distress. For some of the plaintiffs, but not remotely all, that it is indeed a very important cause of action. For those family members that are not themselves U.S. nationals or employees or contractors, it is their cause of action. Because the cause of action under 1605 cap A sub C is limited to U.S. persons, employees, contractors, et cetera. So am I to assume as well that you would take a similar position in regard to the appellant's arguments regarding the awarding of punitive damages? Yes. It's forfeited. It's also Judge Bates' ruling is clearly correct. That Congress could not have been more clear that it wanted punitive damages applied in pending cases. Section 1083 has a subsection entitled application to pending cases. That's what the statute is all about. There's no doubt about the intended retroactivity of the statute. Is that the producer's title or Congress' title? I believe it was Congress' title. I can confirm that if you give me just one moment. No, that's all right. It was Congress' title before the Warren case. It says application to pending cases. And that's 1083 subsection C of the 2008 Act. So Landgraf has no relevance? Well, I think this court, well, the Supreme Court in Altman said that the retro, the Landgraf presumption just doesn't apply to the FSIA because judgments Congress makes about how to allocate liability and immunity to foreign states is different in kind from laws that govern private conduct. I thought punitive damages were awarded here as to those who came in under the 2008 National Defense Appropriations Act amendment. Which is an amendment to 1605A of the foreign, it replaced. The answer is yes. Yes. It replaced part of the Foreign Sovereign Immunities Act and is now part of the Foreign, regarded as part of the Foreign Sovereign Immunities Act. This decision by Congress occurred long after the events that caused your client's harm. I think that was true when Congress enacted the Plato Amendment. It was 13 years after the Beirut bombings. And providing a cause of action. And for punitive damages. Right, but there had been no cause, several causes of action before that. But the point of the Plato Amendment was not merely to provide a cause of action. It was also to provide punitive damages. And district courts in this building repeatedly awarded punitive damages under the Plato Amendment. There's no question what Congress intended here. And so the retroactivity presumption really just falls away. Because it's at most a presumption that can be overcome by Congress's clear statements and clear intent. And we have that. We have that here. Right. You need to wrap it up. Yeah. Well, if the court has no further questions. All right. Thank you. Thank you. Does Mr. Curran have any time? No, he doesn't. Okay. Why don't you take a couple of minutes and answer any questions. Thank you, Your Honor. And thank you for your patience overall. The declaration of Ambassador Maiawi stands unrebutted. Explaining the circumstances behind the absence of Sudan from this litigation for a number of years. Sudan is now here both on direct appeal and on the appeal for the denials of the motion to vacate. I think Mr. McGill's arguments seem to be focused only on the motion to vacate standard. But we're also here on direct appeals. In our brief, we undertook to address every factual point that the district court stated in finding material support and proximate causation. And we tried to meticulously explain why the evidence was inadmissible and not probative of material support and punitive damages. And proximate causation. We also addressed a number of other arguments in our brief that Mr. McGill touched upon. Punitive damages. I mean, the Altman case was dealing with the question of immunity, not the question of retroactive imposition of punishment. I think it's a pretty clear application of Landsgraf that the punitive damages cannot be applied here. There's no clear statement in 1083 or elsewhere that Congress intended retroactive punitive damages. The statute of limitations is another thing. Many of the damages being sought in this case now are based on lawsuits that were brought in 2010 and 2012. Well after the hearing and well after the imposition of liability on the Owens case. It's true the Owens case was filed in 2001, but it was the 2008 enactment by Congress enacting 1605 capital A that led to the flurry of the other lawsuits. Judge Henderson, you asked earlier, I think of both Mr. McGill and Mr. Neuberger, about the standard on 1608E. Well, 1608E, of course, requires that the district court, even where you have a defaulting foreign state, to establish the claim or right to relief by evidence. The standard is, I think, the implication there is preponderance of the evidence, as Mr. Neuberger said. The question on both direct appeal and on the appeal from the denials of vacatur is, did the district court establish the claims or did the plaintiffs establish their claims by evidence? And Kim teaches us that that means admissible evidence under the federal rules of evidence. The Jarez case, J-E-R-E-Z, by this court, establishes that practical concepts and its solicitude of the interest of foreign states in the U.S. litigation is supplemented by the 1608E standard. It is true that foreign states are given significant breaks when they're faced with litigation in the U.S. That should not be considered surprising because the very notion that a foreign state can be sued in a domestic court is a controversial subject. But here, Sudan, which was riven with civil war and humanitarian crises for years, resulting in the partition of the country, not just a civil war but a civil war resulting in a split of the country, is now here ready, willing, and able to litigate this case on the merits. If there's any prejudice to the plaintiffs as a result of that, we're willing to consider steps to mitigate that prejudice, including waiving the requirement that any victims have to testify again and other measures. We just want a litigation on the merits. So thank you very much for your time. All right. Thank you. Mr. Newberger, will you submit? Now I'm not sure what you're submitting, but make sure your opposing counsel gets a copy. It's what Judge Rogers wanted. Yes, understood, and of course we will serve the opposing counsel. Okay.
judges: Henderson, Rogers, Ginsburg